TRANSFER/JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1488-GW-Ex | Date | July 30, 2019 |
|---|---|---|---|
| Title | R.A. v. Epic Games, Inc. | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - FINAL RULING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION OR TRANSFER [26]

Attached hereto is the Court's Final Ruling. This Court would DENY Defendant's Motion to Compel Arbitration, but GRANT Defendant's Motion to Transfer Venue to the Eastern District of North Carolina.

                                                                                                                                                                                                  :

| | Initials of Preparer | JG |
|---|---|---|

<u>R.A. v. Epic Games, Inc.;</u> Case No. 2:19-cv-01488-GW-(Ex)
Final Ruling on Motion to Compel Arbitration or Transfer

I.   **Background**

   A.  <u>Factual Background</u>

      1.  *Allegations in the Complaint*

   R.A., by and through his Guardian, Steve Altes ("Plaintiff") brings this putative class action against Epic Games, Inc. ("Epic" or "Defendant") alleging the following: (1) violation of the Consumer Legal Remedies Act, Cal Civ. Code §§ 1750 *et seq.* ("CLRA"); (2) unjust enrichment; and (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL").  *See generally* Complaint, Docket No. 1.  Plaintiff seeks to represent a class consisting of: "All persons in California who, within the applicable statute of limitations, purchased a Llama with V-Bucks that they bought with money in Fortnite Save the World."  *Id.* at ¶ 112.

   Plaintiff alleges the following relevant facts: Defendant is a video game company based in North Carolina.  *Id.* ¶ 24.  In 2017, Defendant released the popular video game "Fortnite."  *Id.*  Fortnite is an open-world survival video game in which players collect weapons, tools, and resources (herein referred to as "loot") in order to survive and advance in the game.  *Id.* ¶ 25.  Fortnite currently has two game modes: Fortnite Save the World and Fortnite Battle Royale.  *Id.*  Plaintiff is a Fortnite player who plays Fortnite Save the World, and resides in Valencia, California.  *Id.*  ¶¶ 18-19.  Plaintiff used his own and his parents' money to purchase loot in Fortnite Save the World.  *Id.* ¶ 20.  This lawsuit only relates to the Defendant's alleged misrepresentations and failure to disclose material facts in the marketing and selling of loot in Fortnite Save the World.  *Id.* ¶¶ 25, 112.

   Fortnite Save the World is a cooperative game mode where up to four players can play together on various missions and fight computer-controlled enemies.  *Id.* ¶¶ 28-29.  Players can either earn through gameplay or purchase loot boxes (also referred to as "Loot Llamas"), which are an in-game reward system that provides randomized loot to help players progress in the game.  *Id.* ¶¶ 65-66.  Opening Loot Llamas gives players special characters and schematics to build traps, weapons, or other valuable items.  *Id.* ¶¶ 59-62.  Rarer items tend to be generally more valuable, but also more difficult to obtain.  *Id.* ¶¶ 63-64.

1

To purchase Loot Llamas, players must use in-game currency known as "V-Bucks." *Id.* ¶ 66. V-Bucks are either purchased or earned by playing Fortnite Save the World. *Id.* ¶ 67. Earning V-Bucks is a difficult and inconsistent process because of the amount of playtime needed and the randomness at which V-Bucks are offered as rewards to players. *Id.* ¶ 68. Thus, players are induced into purchasing V-Bucks. *Id.* The price for one hundred V-Bucks generally costs around $1.00. *Id.* ¶ 69. In some instances, players can purchase V-Bucks at a discount by purchasing a higher quantity. *Id.*

Plaintiff believes younger players have difficulty conceptualizing how much actual money is spent on these in-game purchases with V-Bucks. *Id.* ¶ 71. By only allowing V-Bucks to be bought in currency packs and setting the prices of items at odd amounts, Defendant induces players to need more currency to buy them. *Id.* ¶ 72. It is easy for players to spend an exorbitant amount of V-Bucks at any given time because Defendant does not provide a history of a player's in-game purchases. *Id.* ¶ 74. Defendant also induces players to make more purchases by allowing them to save their payment method to purchase more V-Bucks at any time. *Id.* ¶ 75.

Fortnite offers different Loot Llama options for purchase that allegedly correspond to the "rarity" of the potential loot contained inside. *Id.* ¶ 78. Loot Llamas come in different tiers: regular, silver, and gold. *Id.* When players move their cursor over a specific Llama, a bubble appears showing loot and a description (referred to as "thought bubbles") that players understand as an indication of what is likely to be contained inside. *Id.* ¶¶ 80-81. The actual odds of receiving specific, in-game items with these Loot Llamas are not displayed. *Id.*

When opening the Loot Llamas, players are brought to a screen where the player uses a stick to open the Llama piñata. *Id.* ¶ 83. If the Loot Llama is of the "regular" tier, it will break open upon the strike. *Id.* ¶ 84. If it is of the "silver" tier, there will be a metal clunking sound to reveal a silver Loot Llama. *Id.* Players have the chance of seeing their Llama piñata go from a regular tier to the gold tier, reflecting the increased rarity of the loot inside. *Id.* ¶ 85.

Among the variety of Loot Llamas, there are Upgrade and Daily Llamas. *Id.* ¶¶ 88, 96. Upgrade Llamas are the only Llamas available for purchase at all times and have the random chance to upgrade at a relatively discounted price. *Id.* ¶¶ 88-89. Daily Llamas rotate on a twenty-four-hour basis and offer high-tier loot at a premium price for specific items or classes. *Id.* ¶¶ 96-98.

Plaintiff mainly claims two misrepresentations and omissions by Defendant: (1)

Defendant's usage of thought bubbles next to the Llamas are deceptive because it often displays a rare, sought-after item when in fact the odds of getting that item are low; and (2) Defendant does not display the odds of receiving the higher-tier loot.  *Id.* ¶¶ 94-95, 100.  For example, Defendant describes the Upgrade Llama as "[t]he old faithful llama, packed with a variety of goodies and upgrade materials.  Contains at least 4 items, including a rare item or a hero!  Has a high chance to upgrade.  Hitting the upgrade symbol will upgrade it."  *Id.* ¶ 90 (citation omitted).  Far more times than not, the Upgrade Llama will not "upgrade."  *Id.* ¶ 93.  Likewise, Daily Llamas, which offer high-tier loot at a premium price only for a twenty-four-hour period, are deceptive due to the "sense of artificial scarcity" that induces players to purchasing them before they expire.  *Id.* ¶¶ 96, 99-102.

       2. *Additional Evidence*

In support of its motion to compel arbitration or transfer venue, Defendant offered the following facts and concomitant evidence: Since Fortnite's launch in 2017, all users have to affirmatively agree to the Fortnite End User License Agreement ("EULA").  *See* Motion to Compel Arbitration ("Motion"), Docket No. 26; Declaration of James Farnsworth ("Farnsworth Decl."), Docket No. 28, ¶ 7.  Every version of the Fortnite EULA has called for non-arbitrable disputes to be heard in North Carolina and governed by North Carolina law.  *Id.* ¶ 8.  When someone downloads Fortnite and starts to play, the EULA is displayed on-screen for the user, with a check box reading, "I have read and agree with the End User License Agreement."  *Id.* ¶ 9.  After checking the box, the user must confirm a second time by clicking the "Accept" button before playing.  *Id.*

On October 8, 2017, Plaintiff's Fortnite account was created on a personal computer using Steve Altes' email address as the contact information.  *Id.* ¶ 14.  The account's creator agreed to the operative EULA at that time ("2017 EULA"), which included language about future amendments to the agreement.  *Id.* ¶ 15.  The 2017 EULA advises users that Defendant may update it at any time: "Epic may issue an amended Agreement . . . at any time in its discretion by posting the amended Agreement . . . on its website or by providing you with digital access to amended versions . . . when you next access the Software."  *Id.* ¶ 10.  Further, the EULA advises persons accepting that "if any amendment to this Agreement . . . is not acceptable to you, you may terminate this Agreement and must stop using the Software."  *Id.*

In March 2019, Defendant issued a 2019 EULA, which included a binding, individual

3

arbitration and class action waiver requirement. *See id.,* Ex. B ("2019 EULA") ¶ 3; *see also* Reply in Support of Motion ("Reply"), Docket No. 35, at 6. Starting on March 15, 2019, Defendant displayed the 2019 EULA to all users who logged on. The 2019 EULA includes a bolded and all-capitalized section about binding arbitration and class action waiver. *See Farnsworth Decl.* ¶¶ 12-13.

On March 18, 2019, a person logged into Plaintiff's account and accepted the 2019 EULA by checking the box and clicking "Accept." *Id.* ¶ 18. The 2019 EULA provides that "to enter into [it]" a person "must be an adult of the legal age of majority," and that if the player is a minor, "your parent or legal guardian must consent to this Agreement." *See* Motion at 2. Once the user accepted the agreement on March 18, Plaintiff had thirty days to opt out of the arbitration requirement. 2019 EULA ¶ 12.6. The thirty-day period to opt out lapsed on April 18, 2019 without Plaintiff having exercised that right. Farnsworth Decl. ¶ 20.

In October 2017, Plaintiff claims he downloaded and installed Fortnite, with the help of his brother, who is also a minor, on his personal computer. *See* Declaration of R.A. ("R.A. Decl."), Docket No. 32-1, ¶ 2. Plaintiff used his father's email address to register for an account with Epic, and the father was not involved in the account's creation. *Id.* ¶ 3; *see also* Farnsworth Decl. ¶ 14. When Plaintiff clicked through the EULA, he did not read or understand any of the EULA or ask his father's permission to do so. *Id.* ¶¶ 5-6. Plaintiff's father did not ever see, read, or agree to Epic's EULA in October 2017. *See* Declaration of Steve Altes ("Altes Decl."), Docket No. 32-2, ¶ 2.

When Defendant posted its 2019 EULA in March 2019, Plaintiff was the only person with access to the account who could have clicked through the agreement. *See* R.A. Decl. ¶¶ 7-8. Plaintiff's father again did not see, read, or agree to Epic's 2019 EULA. *See* Altes Decl. ¶ 3. For both the 2017 and 2019 versions of the EULA, Plaintiff states that "I do not consent to arbitrate any of the claims in this action and disaffirm the 2017 and 2019 EULA." *See* R.A. Decl. ¶ 9.

Defendant presents evidence showing that Plaintiff was still actively playing Fortnite on June 18, 2019, more than a month after Defendant filed its motion to compel arbitration. *See* Reply at 1; *see also* Declaration of Joseph Babcock ("Babcock Decl."), Docket No. 35, Exhibit A, ¶ 6. But, as of now, there is no evidence that Plaintiff has played the game since he filed his declaration on June 19, 2019.

All of Plaintiff's in-game purchases have been made with a MasterCard or a PayPal account belonging to Steve Altes, and not to R.A.  *See* Farnworth Decl. ¶ 17.  Steve Altes' PayPal information was added to R.A.'s Fortnite player account on March 2, 2018, while Altes' MasterCard information was added on April 5, 2018.  *See* Babcock Decl. ¶ 3.  The most recent in-game purchase on Plaintiff's Fortnite account was on June 11, 2019.  *Id.* ¶ 5.

    B.  Procedural Background

On February 28, 2019, Plaintiff filed a complaint asserting claims of unjust enrichment and violations under the CLRA and FAL.  *See generally* Complaint.  Defendant now moves to compel Plaintiff to arbitration, or, in the alternative, to transfer the action to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404(a).  *See* Motion.  Plaintiff opposes.  *See* Plaintiff's Opposition to Defendant's Motion to Compel Arbitration or Transfer ("Opp'n"), Docket No. 32.  Defendant filed a Reply.  *See* Reply.

**II.**    **Legal Standard**

    A.  Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration."  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citation omitted).  "By its terms, the [FAA] leaves no room for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) (emphasis in original); *see also* 9 U.S.C. § 4.  "The court's role under the Act is therefore limited to determining: 1) whether a valid agreement to arbitrate exists and, if it does, 2) whether the agreement encompasses the dispute at issue.  If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms."  *See Daugherty v. Experian Info. Sols., Inc.*, 847 F. Supp. 2d 1189, 1193 (N.D. Cal. 2012) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  "While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'"  *See Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)).

    B.  Motion to Transfer Venue

Pursuant to 28 U.S.C. § 1404(a), a court "may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). A § 1404(a) analysis differs if a valid forum-selection clause is present. *See Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 52 (2013) (internal quotations omitted). When there is a valid forum-selection clause, "a district court should ordinarily transfer the case to the forum specified in that clause" with exception of "[o]nly under *extraordinary circumstances* unrelated to the convenience of the parties . . . ." *Id.* at 581 (emphasis added). Accordingly, the Supreme Court modified the § 1404(a) analysis in three ways: (1) plaintiff's choice of forum has no weight, and that the burden falls on the plaintiff to show that transfer to the forum is unwarranted; (2) a district court should only consider public-interest factors; and (3) the transfer of venue will not carry with it the original venue's choice of law rules. *Id.* at 63-65.

### III. Discussion

#### A. Motion to Compel Arbitration

Defendant has moved to compel arbitration based on the 2019 EULA's arbitration provision. In his Opposition papers, R.A. purportedly disaffirms the contract. Thus, before assessing whether Epic can compel Plaintiff to arbitrate, the Court must consider whether Plaintiff validly disaffirmed. First, the Court will determine which state's disaffirmation law applies: California or North Carolina.

##### 1. *Which State Law Governs Whether a Valid Contract Exists*

Both parties agree that California and North Carolina law recognize a minor's right to disaffirm and that the disaffirmation analysis would not necessarily vary depending on which state law is applied. *See* Opp'n at 6, n.5; Reply at 4. "It is well settled that the conventional contracts of an infant . . . are voidable at the election of the infant and may be disaffirmed by the infant during minority or within a reasonable time after reaching majority." *See Bobby Floars Toyota, Inc. v. Smith*, 269 S.E.2d 320, 321 (N.C. Ct. App. 1980) (citation omitted); *Gastonia Personnel Corp. v. Rogers*, 172 S.E.2d 19, 21 (N.C. 1970) (same); Cal. Fam. Code § 6710. Moreover, Defendant primarily argues using California disaffirmation law. *See* Reply at 3-6; Opp'n at 5, n.3; *see also Campos v. JPMorgan Chase Bank, NA*, 2019 WL 827634, at *4 (N.D. Cal. Feb. 21, 2019) (applying California law because "[b]oth parties apply California law . . . to the existence of a valid arbitration agreement.").

6

While Defendant initially cited to this Court's ruling in *McKee* to argue that the laws of North Carolina should apply based on the choice of law provisions in the EULAs, Plaintiff's purported disaffirmation in his Opposition changes the analysis. *See* Motion at 8; *McKee v. Audible, Inc.*, 2017 WL 4685039, at *4 (C.D. Cal. July 17, 2017) ("the parties' choice of law reflected in a contract clause will govern provided the chosen state bears a substantial relationship to the parties or their transaction and enforcement of the provision does not violate a fundamental public policy of California."). Plaintiff contends that the Court need not consider the choice of law provision in determining whether he validly disaffirmed the EULAs. *See* Opp'n at 3-4; *see also Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir. 2008); *Javier v. Carnival Corp.*, 2010 WL 3633173, at *3 (S.D. Cal. Sept. 13, 2010).

The Court agrees that the choice of law provisions in the EULAs do not control which state's disaffirmation law applies. In *Trans-Tec*, the Ninth Circuit held that it could not "rely on the choice of law provision until [it had] decided, as a matter of law, that such a provision was a valid contractual term . . . ." *Trans-Tec Asia*, 518 F.3d at 1124. The Ninth Circuit proceeded to analyze the issue of a valid contract "as if there were no choice of law clause." *Id.* Here, it would be incongruous to rely on a choice of law provision in the contract that Plaintiff supposedly disaffirmed. As such, the Court would disregard the choice of law provision in determining whether Plaintiff disaffirmed.

When there is no choice of law provision, federal courts will use "the choice of law rules of the forum state." *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010) (holding that "[u]nder California law, the choice-of-law rules differ depending on whether the parties have included a choice-of-law agreement in their contract and . . . whether the claims being litigated fall with the scope of that agreement."). In California, federal courts apply the law of the state where the contract was formed with respect to "issues concerning contract formation." *See Lopez v. Kmart Corp.*, 2015 WL 2062606, at *4 (N.D. Cal. May 4, 2015) (citing *Ingle v. Circuit City Stores, Inc.*, 328 F.3d, 1165, 1170 (9th Cir. 2003)). Here, any contract between R.A. and Defendant would have been formed in California, where Plaintiff was playing the game and clicked through the EULAs. As such, the Court will use the laws of California to analyze whether Plaintiff disaffirmed the EULAs.

    2. *Whether Plaintiff Disaffirmed the Entirety of the 2017 and 2019 EULAs*

In California, a minor may contract "in the same manner as an adult, subject to the power

of disaffirmance." *See* Cal. Fam. Code. § 6700. Minors can disaffirm a contract before reaching the age of majority or within a reasonable time afterwards. *See* Cal. Fam. Code § 6710. The doctrine of disaffirmation is to protect "a minor against himself and his indiscretions and immaturity as well as against the machinations of other people and to discourage adults from contracting with an infant." *Niemann v. Deverich*, 98 Cal. App. 2d 787, 793 (1950); *see also Sparks v. Sparks*, 101 Cal. App. 2d 129, 137 (1950). "Any loss occasioned by the disaffirmance of a minor's contract might have been avoided by declining to enter into the contract." *Niemann*, 98 Cal. App. 2d at 793.

A minor may disaffirm a contract by "any act or declaration disclosing an unequivocal intent to repudiate its binding force and effect." *Spencer v. Collins*, 156 Cal. 298, 303 (1909). "Express notice to the other party is unnecessary." *Abdullah v. Abdullah*, 50 Cal. App. 115, 119 (1920) ("[F]iling of the action for a recovery. . . would be a sufficient notice to the defendant of a disaffirmance of the contract . . . ."); *see also Celli v. Sports Car Club of Am., Inc.*, 29 Cal. App. 3d 511, 517 (1972).

Disaffirmance must be complete in that a minor "must disaffirm the entire contract, not just the irksome portions." *Holland v. Universal Underwriters Ins. Co.*, 270 Cal. App. 2d 417, 421 (1969); *see also C.M.D. ex rel. De Young v. Facebook, Inc.*, 621 F. App'x 488, 489 (9th Cir. 2015) (affirming the lower court ruling that while plaintiff "may have intended to disaffirm the contract[]… a party cannot apply to his own use that part of the transaction which may bring to him a benefit, and repudiate the other, which many not be to his interest to fulfill." (internal citation omitted)) ("*CMD*"). "[T]he disability of infancy [is not] a 'sword' rather than a 'shield [.]'" *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 899 (S.D. Ill. 2012) (applying California law) (international citation omitted). "The infancy defense may not be used inequitably to retain the benefits of a contract while reneging on the obligations attached to that benefit." *Id.* (citing *MacGreal v. Taylor*, 167 U.S. 688, 701 (1897)).

As result of disaffirmation, "a minor rescinds the entire contract, rendering it a nullity." *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F.Supp.2d 989, 1000 (N.D. Cal. 2012) ("*Fife*"). A minor is "permitted to disaffirm all obligations under a contract, even for services previously rendered, without restoring consideration or the values of services rendered to the other party." *Deck v. Spartz, Inc.*, 2011 WL 7775067, at *7 (E.D. Cal. Sept. 27, 2011) (citing *Berg v. Traylor*, 148 Cal. App. 4th 809, 819-20 (2007)). Since an action for disaffirmance is one in equity, "the trial court

8

is vested with a broad discretion to see that equity is done." *Id.* at \*6 (internal quotations and citation omitted).

Here, Plaintiff first argues that his filing of this lawsuit is sufficient to disaffirm the contract. *See* Opp'n at 8. Defendant contends Plaintiff cannot disaffirm because he did not do so in the Complaint. *See* Reply at 3. As such, Defendant argues Plaintiff must first amend his complaint before the Court can rule on disaffirmation. Defendant is mistaken that Plaintiff must amend before the Court can rule. The present case involves a motion to compel arbitration where extrinsic evidence, including declarations, is considered and both sides filed multiple declarations in support of their positions.

Turning to whether, and (if so) when, Plaintiff disaffirmed the EULAs, the Court would conclude that Plaintiff did not disaffirm upon the filing of the Complaint, but that his June 19, 2019 declaration validly disaffirmed the 2019 EULA. First, the Court agrees with Defendant that because Plaintiff continued to play Fortnite until at least June 18, 2019 – after the filing the Complaint – he continued to enjoy the benefits of the agreement and therefore did not effectively disaffirm. *See* Reply at 13-14; Babcock Decl. ¶ 6; *CMD*, 621 F. App'x at 488 ("By continuing to use facebook.com after bringing their action, [p]laintiffs manifested an intention not to disaffirm the contract."); *E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 899 (S.D. Ill. 2012) (applying California law) (finding that plaintiffs cannot disaffirm the forum-selection clause in the agreement because they used and continue to use facebook.com).

Nevertheless, the Court would find Plaintiff's declaration on June 19, 2019 to be a valid disaffirmation of at least the 2019 EULA.[1] In his declaration, Plaintiff unequivocally expresses his intent to disaffirm the EULAs. He states: "I do not consent to arbitrate any of the claims in this action and disaffirm the 2017 and 2019 EULA." R.A. Decl. ¶ 8. "No specific language is required to communicate an intent to disaffirm." *Berg*, 148 Cal. App. 4th at 820. Furthermore, there is no evidence at this time that Plaintiff continued playing the Fortnite video game after he submitted his declaration that would contradict his intent to disaffirm the entirety of the EULAs.[2]

---

[1] On July 29, 2019, the Court held oral argument on the Motion, and Defendant did not raise any contention or present any evidence that R.A. played Fortnite after the filing of his June 19, 2019 declaration.

[2] The Court notes that neither party addresses whether a minor may purportedly disaffirm a contract multiple times. It would seem inequitable that a minor could keep using a product and then disaffirm it as soon as the other side to the agreement tries to enforce an obligation from the agreement. Then again, maybe that is the risk of doing business with a minor, and an example of why the disaffirmance doctrine discourages entering into agreements with

Aside from Plaintiff's continued gameplay, Defendant claims that Plaintiff's disaffirmation is invalid because a minor cannot disaffirm in-game purchases to recover consideration paid by his or her parents. *See* Reply at 5. At oral argument, Defendant limited this argument to the 2017 EULA. Defendant also argued that because Plaintiff only disaffirmed after the filing of the Motion, it did not have a full opportunity to brief the matter of whether Plaintiff validly disaffirmed the 2017 EULA. Thus, Defendant asked the Court to withhold judgment on the matter, if it intends to transfer the case to North Carolina.

While the Court recognizes that at least one district court in the Ninth Circuit has rejected Defendant's argument, *see Fife*, 905 F. Supp. 2d at 1003, the Court need not reach the issue because the argument only pertains to the 2017 EULA, and that agreement did not contain an arbitration provision. Further, as discussed below, because the Court would transfer the case to the Eastern District of North Carolina based on the § 1404(a) factors, rather than any forum selection clause, the Court will leave the question of whether R.A. validly disaffirmed the 2017 EULA as an open question.

### 3. Validity and Scope of the Arbitration Agreement

Since Plaintiff validly disaffirmed the 2019 EULA, the Court need not reach the validity of the arbitration provision contained therein, and would accordingly deny Defendant's motion to compel arbitration.

### B. Motion to Transfer

Given that the Court would conclude Plaintiff has disaffirmed the 2019 EULA (and will assume *arguendo* for the purposes of this Motion only) that Plaintiff has disaffirmed the 2017 EULA, there is no forum selection clause to modify the analysis of the motion to transfer pursuant to § 1404(a). However, even under the traditional § 1404(a) analysis, the Court would find transfer to be warranted for reasons discussed below.

Under a traditional § 1404(a) analysis, a court "must evaluate both the convenience of the parties and the various public interest considerations . . . and decide whether, on balance, a transfer would serve the convenience of parties and witnesses and otherwise promote the interest of justice." *Atl. Marine Const.*, 134 S. Ct. at 581; 28 U.S.C. § 1404(a). The moving party bears the burden in demonstrating that transfer is appropriate. *See Commodity Futures Trading*

---

minors. *See Niemann*, 98 Cal. App. 2d at 793 ([A] person deals with a minor at his peril whether or not he has notice, actual or constructive, of the minor's disability . . . .").

*Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979); *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1155 (S.D. Cal. 2005). A court has broad discretion to decide a motion to transfer venue because the analysis is "flexible and individualized." *See Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

Section 1404(a) only defines three factors to consider: the convenience of the parties, the convenience of witnesses, and the interest of justice. The Ninth Circuit noted that district courts can consider additional public and private interest factors:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof . . . . [as well as (9)] the relevant public policy of the forum state[.]

*Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000). Moreover, "[p]ublic interest factors [also] include the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; . . . and the unfairness of burdening citizens in an unrelated forum with jury duty." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (internal quotations and citation omitted).

   1. *Plaintiff's Choice of Forum*

The Court first addresses whether and to what extent the court should defer to Plaintiff's choice of forum. Typically, "[a] plaintiff's choice of forum is accorded substantial weight in proceedings under § 1404(a) (so-called 'home turf' rule)." Virginia A. Phillips & Karen L. Stevenson, *Fed. Civ. Pro. Before Trial Ch. 4-K: "Convenience" Transfers*, § 4:760 (Rutter Group 2019). However, "when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) (internal citation omitted); *see also Billing v. CSA-Credit Sols. of America, Inc.*, 2010 WL 2542275, at *5 (S.D. Cal. June 22, 2010) (citing *Lou*, 834 F.2d at 739). To determine the amount of weight to accord a plaintiff's choice of forum, courts consider the extent of the parties' contacts with the forums. *Lou*, 834 F.2d at 739. "If the operative facts have not

11

occurred within the forum and the forum has no interest in the parties or subject matter, [plaintiff's] choice is entitled to only minimal consideration." *Id.* Often, when a plaintiff brings a case in his home district and represents a class limited to residents of that state, the plaintiff's choice of forum counsels against transfer. *See, e.g.*, *Burns v. Gerber Products Co.*, 922 F.Supp.2d 1168, 1172 (E.D. Wash. 2013) (recognizing that "Plaintiff's choice to bring suit in Washington is afforded substantial weight" because he resides in the state and all putative class members purchased the allegedly misadvertised products in Washington, but holding that transfer to New Jersey was still warranted considering that the development and marketing of the products took place.); *see also Cardoza v. T-Mobile USA Inc.*, 2009 WL 723843, at *4 (N.D. Cal. Mar. 18, 2009) ("The Court does not give less weight to Plaintiff's choice of forum based on Plaintiff's decision to bring this suit on behalf of a class. Courts tend to do so in cases where the plaintiff seeks to represent a nationwide class. Here, Plaintiff's putative classes are limited to California consumers.") (citations omitted).

Here, Defendant argues that the operative facts occurred in North Carolina. *See* Motion at 18. Defendant carried out the development, programming, functioning, and marketing of the Loot Llamas at its headquarters in Cary, North Carolina. *Id.* Thus, because of the class nature of Plaintiff's claims and the operative facts occurring in North Carolina, Defendant believes transfer is appropriate. Conversely, Plaintiff argues that he is still entitled to choose his forum because the presumption in favor of his choice is only reduced when the class actions are "purely fortuitous" or bear no connection to Plaintiff's or the putative class claims. *See Sonoda v. Amerisave Mortg. Corp.*, 2011 WL 2653565, at *4 (N.D. Cal. July 6, 2011) (finding plaintiff's choice of forum was not purely fortuitous because plaintiff resides in the district, seeks to represent a California subclass under the CLRA, and defendant had contacts with California that gave rise to plaintiff's claims); *see also Holliday v. Lifestyle Lift, Inc.*, 2010 WL 3910143, at *6 (N.D. Cal. Oct. 5, 2010) (finding that plaintiff alleged violations occurred in the plaintiff's choice of forum and thus "carries some weight"). Plaintiff asserts that he filed this case in his home district, under California law, and on behalf of a class of California consumers. Opp'n at 22.

The Court would find that Plaintiff's choice of forum is entitled to some deference. Plaintiff resides in this district and played the game on his personal computer here. *See* Complaint ¶ 18; R.A. Decl. ¶ 2. Likewise, R.A. only alleges claims under California law, *see*

12

*generally* Complaint, and limits his putative class to "[a]ll persons *in California* who, within the applicable statute of limitations, purchased a Llama with V-Bucks that they bought with money in Fortnite Save the World." *Id.* ¶ 112 (emphasis added). And, Plaintiff's (and other class members') understanding of the Loot Llamas will also be a relevant issue.[3]

Still, the crux of Plaintiff's claims is that Defendant misrepresented the likelihood of obtaining significant advantages from the Loot Llamas. Where a plaintiff's claims concern misrepresentations or false advertising, the operative facts stem from where the statements were made or where the products were developed. *See Burns*, 922 F. Supp. 2d at 1171 ("Thus, the crux of the present case is not Washington, the state where Plaintiff purports to have purchased a falsely advertised product, but rather New Jersey, the state where Gerber is headquartered and allegedly issued misrepresentations concerning its products. The primary focus of this action is the development and marketing of certain Gerber consumer goods, and decisions about how such goods were to be advertised to consumers."); *see also Jovel v. i-Health, Inc.*, 2012 WL 5470057, at *6 (C.D. Cal. Nov. 8, 2012); *Cohn v. Oppenheimerfunds, Inc.*, 2009 WL 3818365, at *5 (S.D. Cal. Nov. 12, 2009). As such, the Court would conclude that most of the operative facts occurred in North Carolina where the game, and more specifically the Loot Llama scheme, was designed, programmed and marketed.

Thus, although Plaintiff's choice of forum is not "purely fortuitous," the amount of weight is still reduced because Plaintiff has not alleged operative facts that occurred in this district beyond his gameplay. Therefore, while this factor weighs somewhat against transfer, it is not determinative.

2. *Convenience of the Parties and Witnesses*

Defendant argues that a transfer is warranted based on the convenience to the parties and witnesses. *See* Motion at 16; *see also Newthink LLC v. Lenovo (U.S.) Inc.*, 2012 WL 6062084, at *1 (C.D. Cal. Dec. 4, 2012); *L.A. Printex Indus., Inc. v. Le Chateau, Inc.*, 2011 WL 2462025, at *3 (C.D. Cal. June 20, 2011). Defendant also claims that the Eastern District of North Carolina is more convenient because nearly all of its witnesses – employees who are familiar with the video game's programming, functioning, and marketing of its Loot Llamas – are located in Cary, North Carolina. *See* Motion at 17. Meanwhile, Plaintiff contends that Defendant's arguments

---

[3] Although not directly relevant at the moment, Plaintiff's class definition would likely need to change to encompass only minors who had validly disaffirmed the 2019 EULA.

13

about its employees being located in North Carolina is weak because "the result [of transferring] is merely to shift the inconvenience from one party to another." *See* Opp'n at 22-23; *see also Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 776 (N.D. Cal. 2014). Additionally, Plaintiff asserts that "the relative ability of the parties to absorb the costs associated with litigating in a distant forum is a valid consideration" that favors Plaintiff over the corporate Defendant. *See Celestial Mechanix, Inc. v. Susquehanna Radio Corp.*, 2005 WL 4715213, at *2 (C.D. Cal. April 28, 2005); *see also Gelber v. Leonard Wood Mem'l for Eradication of Leprosy*, 2007 WL 1795746, at *4 (N.D. Cal. June 21, 2007) (same).

Despite the potential inconvenience to Plaintiff by transferring to another forum, the reality is that one party will have travel cross-country for this trial depending on where the venue is located. At this time, Defendant has made persuasive arguments that the people with the most knowledge about the operative facts of this case (the programming and marketing of Loot Llamas) are in North Carolina, which would support transfer due to convenience to both parties to litigate in the forum where these acts occurred. While the Court recognizes Defendant may be better positioned to absorb the costs of litigation, the Court is not convinced that argument overcomes the fact that nearly all of the witnesses and operative facts are in North Carolina, especially considering that Plaintiff is asserting a class action and has not provided any information about whether he, or his counsel, will bear the costs of litigating the claims. *See* Reply at 12.

Plaintiff further argues that the factor of convenience of the witnesses is less significant when considering that the witnesses are Defendant's employees. *See Lax*, 65 F. Supp. 3d at 779; *see also Gelber*, 2007 WL 1795746, at *3 (finding that the "convenience of defendants' party witnesses are entitled to little weight because the witnesses are employees of the party seeking transfer"). Plaintiff argues any inconvenience to witnesses will be lessened because Defendant can simply require the appearance of its employees in court. *Id.* Plaintiff also offers to mitigate any inconvenience by deposing Defendant's employees in North Carolina. *See Lax*, 65 F. Supp. 3d at 779.

The Court agrees that the convenience of party witnesses is less important than to non-party witnesses, but at this time, the amount of party witnesses predominates over non-party witnesses, such that Court still believes it relevant to the analysis. Moreover, Plaintiff has not identified for the Court the witnesses he might call during trial, so that all the Court has to work

14

with right now is Defendant's employees with knowledge about Loot Llamas who will be the primary witnesses. Therefore, as Defendant states, the Court believes that it would be less costly to litigate this matter in North Carolina where those employees live and work. *See* Motion at 17. Thus, the Court is would find that the convenience factors weigh in favor of transfer.

    3. *Access to Evidence*

"[I]n the age of electronically stored information, the ease of access to evidence is neutral because much of the evidence in this case will be electronic documents, which are relatively easy to obtain in any district." *See Simpson Strong-Tie Co., Inc. v. Oz-Post Int'l, LLC*, 2018 WL 3956430, at *8 (N.D. Cal. Aug. 17, 2018). While there may be marginal advantages and cost-saving mechanism regarding access to evidence in North Carolina, this factor is essentially neutral.

    4. *Familiarity with Governing Law*

Even assuming that California law would apply in the absence of the choice of law provision in the EULAs, this Court would find the factor basically neutral as to whether the case should be transferred because federal courts are comfortable applying different states' laws, and the laws at issue here are not complex. *See Burns*, 922 F.Supp.2d at 1171-72; *Bloom v. Express Servs. Inc.*, 2011 WL 1481402, at *5 (N.D. Cal. Apr. 19, 2011).[4]

    5. *Administrative Difficulties from Court Congestion*

Defendant argues that there are no administrative difficulties involved with litigating Plaintiff's case in the Eastern District of North Carolina. *See* Motion at 15. While Defendant might be right, that does not necessarily weigh in favor of a transfer. Plaintiff notes that although there are fewer cases in the Eastern District of North Carolina, the median time to litigate cases in the Central District of California takes only five months as opposed to nearly ten months in the Eastern District of North Carolina. *See* Opp'n at 20. While the reference to those statistics is informative, the Court would note that, at this time, there are nine judicial vacancies as to the 28 judgeships in the Central District of California bench (over 30%) with no relief in sight.

    6. *Summing Up*

On balance, while Plaintiff's choice of forum is subject to some deference, the Court

---

[4] The Court would also find that California and North Carolina both have an interest in the outcome of this case because the Plaintiff is a California resident and Defendant a North Carolina corporation. Thus, the interest of the states is a neutral factor.

15

would conclude that the parties' contacts with North Carolina, the amount of witnesses located there, and the fact that the Central District of California bench is vastly understaffed weigh in favor of transfer.  Otherwise, the factors involved in the traditional § 1404(a) analysis are largely neutral.  Fundamentally, this is a case about the design and marketing of the Loot Llamas.  The operative facts surrounding the design and marketing of those challenged products occurred in North Carolina.  As such, the Court would transfer the action to the Eastern District of North Carolina.

## IV.  Conclusion

For the foregoing reasons, this Court would **DENY** Defendant's Motion to Compel Arbitration, but **GRANT** Defendant's Motion to Transfer Venue to the Eastern District of North Carolina.